J-A02035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SAM E. COLTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KATHERINE COLTON | : | No. 558 WDA 2021 |

Appeal from the Order Entered April 15, 2021
In the Court of Common Pleas of Butler County Civil Division at No(s):
18-90025-D

BEFORE:  OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:              **FILED: FEBRUARY 9, 2022**

Sam E. Colton (Husband) and Katherine Colton (Wife) were involved in contentious divorce litigation that proceeded to an equitable distribution trial before a Master.  The Master issued a Report and Recommendation (Report) dividing the marital assets, including the marital home.  When neither party filed exceptions, the Court of Common Pleas of Butler County (trial court) entered a divorce decree and incorporated the Report into an equitable distribution order (Order).

After the Order was ratified, Husband unilaterally drew $75,015.81 from a Home Equity Line of Credit (HELOC) on the marital home, which he used to purchase his new home.  Wife discovered the HELOC only after the parties

_____

Retired Senior Judge assigned to the Superior Court.

J-A02035-22

were proceeding to close on the sale of the marital home. As a result, Wife filed a petition for relief seeking compensation for the reduction in value of the marital home, an equitable interest in Husband's new home and attorney's fees. As discussed in more detail *infra*, at a hearing on the motion, the parties resolved the dispute when Husband agreed to pay Wife $67,000.

Shortly after the hearing, Husband claimed that he entered the settlement agreement based on a mutual mistake about the terms of the Report relating to the equitable distribution of the marital home. In the alternative, he claimed the settlement was the result of a unilateral mistake that Wife knew or should have known about at the time the contract was formed. Following briefing and argument, the trial court denied relief and Husband now appeals that determination. We affirm.

**I.**

**A.**

We glean the following facts from the certified record. The Report, which was incorporated and adopted into the Order on March 31, 2020, divided the proceeds from the sale of the marital home as follows: Husband would receive "the first $9,341.00, then 25% of the next $178,069, and then 40% of any net proceeds in excess of $187,500.00." R.R. at 25a.[1] Wife would receive the remainder of the proceeds. Based on the distribution of the funds from

---

[1] For ease of reference, we cite to the reproduced record.

the sale of the house, Wife's earning potential and child support, the Report recommended that Wife's claim for alimony be denied.

In September 2020, Wife filed an Emergency Petition for Special Relief averring that in the closing process for the sale of the marital home, she learned of the previously-undisclosed HELOC. The marital home was ultimately sold for $413,000 and the HELOC and outstanding mortgage were paid from the proceeds. Wife requested that the trial court order Husband to pay her the full value of the HELOC and $10,000 in attorney's fees.

Husband filed a response averring that after the divorce decree was entered, he intended to use funds from his retirement account to purchase a new home. Part of his retirement account was awarded to Wife in the Order and was to be distributed via a Qualified Domestic Relations Order (QDRO) drafted by Wife. When the QDRO was not processed in time for the purchase of his new home, he drew the down payment from the HELOC on the marital home. He averred that he and Wife jointly opened the HELOC during the marriage and that it had a $0 balance at the time of the equitable distribution trial. He claimed that he intended to pay the HELOC with funds received from the QDRO but was unable to do so because it had not been processed. He requested that the trial court deny Wife's petition and award him $750 in attorney's fees and $1,000 in sanctions.

At a hearing on November 30, 2020, Husband stated that he was willing to withdraw from the retirement account to cover the value of the HELOC.

The proceeds from the sale of the house of approximately $71,000 were in escrow. The trial court began by reviewing the sale price for the house, the mortgage and the HELOC in conjunction with the Report. Counsel for Husband then stated that the $71,000 in escrow and the $75,000 HELOC, less the first $9,431 the Master had allocated him from the sale, would result in a remaining balance of $136,569. Counsel then said: "And the way the Master's report is worded is [Wife] gets 75 percent of 178,069, of the proceeds, after the first 9431 are distributed to [Husband]. So, the way I interpret that is, the remaining balance is going to go to Wife because we didn't hit that threshold." R.R. at 72a. Counsel for Wife agreed with that interpretation.

The trial court then suggested that Wife would be entitled to all funds in escrow and the value of the HELOC minus the approximately $9,431 awarded to Husband. Counsel for both parties agreed that would result in Husband paying Wife $65,584.81 in addition to all funds in escrow. Counsel for Husband then represented that he could make the payment by withdrawing the funds from his retirement account, as it would be a quicker resolution than seeking a new loan. The trial court agreed, saying ,"if he is no longer debating that he shouldn't have done it, it's really just a practical matter of how do we make [Wife] whole in the quickest way we can." R.R. at 74a-75a.

The trial court asked if that agreement would resolve the petitions and Wife's counsel responded:

> It would, Your Honor. I would rather get this settled. I think we were going to raise an issue that since he took it out and

- 4 -

purchased another piece of property, that my client has an equitable interest in that. So, I know it's an "oops," but it's kind of a big "oops." I think she could be reimbursed for some attorneys' fees because it took him getting here for him to realize that.

R.R. at 75a-76a. The trial court suggested that it could continue the petitions to allow Husband to make the payment and revisit the issue after that was resolved. Husband then agreed to withdraw his pending petitions and requests for attorney's fees, including a contempt petition related to the delay in filing the QDRO.

When Husband agreed to withdraw his petitions, the trial court said:

So, it sounds to me like that the only thing really left to do would be how much, if any, counsel fees Wife would get for the 750—I mean $75,000 issue. So, I'm going to let you guys talk about that for a few minutes, keeping in mind that, you know, he may drop some of his. But I think she is entitled to some counsel fees. So, why don't I let you guys talk. Talk to your clients, talk about the counsel fees, and see if you can come up with a number that you feel comfortable with. . . . And of course if you don't have an agreement, if your clients don't agree to this, then we will proceed with the hearing. But I'm guessing you are going to get an agreement because I wouldn't—really, what you've offered is probably the only options for sanctions I would have anyway.

R.R. at 77a-78a.

After counsels spoke with their clients, Husband's attorney requested that the proceeds from the sale of the house be offset by the amount each party had paid toward the mortgage that year, based on a Consent Order issued after the Order was entered. Counsel for Wife responded:

I think I've already alluded to my position about the equitable interest that I believe my client has in [Husband's] current residence, and we've agreed to waive that if we work out this

- 5 -

agreement.  I know we haven't gone into the details of it yet, but I think—considering what I discussed with her and what she was willing to do.  They were sharing the payments on the mortgage.  So, they both contributed to it.  And I think that, you know, we just leave that issue be and just work out, you know, the settlement as far as this goes, because we're really dwindling down the amount of money that's available to my client.

R.R. 79a-80a.  After reviewing the Order, the trial court stated Husband's payment to Wife should be reduced by the amount he paid toward the mortgage until May of 2020.  It said:

But that's how I would read the Order that you put in there, that—so basically what they did, then, was they evened all of that off out of the sale by reimbursing each other what they paid.  And then the distribution done by the Hearing Officer still stays the same.  So, wife isn't losing money.

R.R. at 83a.  The parties then agreed to exchange proof of payments for the mortgage and reduce Husband's payment to Wife accordingly.  The trial court asked whether counsel wanted to colloquy their clients before placing the agreement on the record and they declined.

Counsel for Husband finally placed the following terms on the record: Husband would pay Wife $67,000 within 120 days "in consideration of the 75,015 he took out, minus the 9,431 he is awarded for the Master's Report and Recommendation."  R.R. at 85a.  That resulted in $65,584, which the parties agreed to increase to $67,000 to include counsel fees for Wife.  All the proceeds in escrow from the sale would also be disbursed to Wife and Husband's payment would be reduced by his portion of the mortgage

payments for February, March and April 2020. Wife's mortgage payments in those months would offset Husband's payment.

The parties agreed to exchange proof of their payments within 14 days and Husband withdrew his petitions for contempt. The trial court ordered that Wife's petition for relief would remain open for 120 days or until full payment was made, whichever occurred first.

**B.**

Shortly thereafter, Husband requested a status conference and argued that there was a mutual mistake regarding the distribution of the proceeds from the sale of the marital home in the Report and subsequent Order. He claimed that based on the language in the Report, he was entitled to 25% of the proceeds of the sale after his initial payment of $9,431 was taken out. At the hearing on Wife's petition, the parties had believed Wife was entitled to 100% of those proceeds.

When asked to clarify his argument, Husband's counsel said that he was asserting there was a "misinterpretation" of the Report more so than a mutual mistake as to the terms. R.R. at 96a. The trial court asked whether the Report was ambiguous on its face or whether the Master made a mistake in drafting the terms. Husband agreed that the Report was "correct" and the language was unambiguous, but that he simply misread the agreement at the prior hearing because it was "worded confusingly." R.R. at 97a-98a. He continued, "[i]t says 25 percent of the next $178,069. I think that's clear that

the Master intended my client to receive 25 percent of the proceeds after he gets [$]9[,]431." R.R. at 98a. Based on that formula, Husband argued his payment to Wife should be reduced by $34,153. R.R. at 101a-02a.

While Wife's counsel agreed that they had examined the Report at the previous hearing, she contended that the final settlement was based purely on the sum agreed to by the parties, not the terms of the Report:

> And although we had looked at the Master's report—I agree with that—what I took to my client was a number. Because it was, [y]ou're going to get, you know, all of the amount that was escrowed at my firm, plus you're going to get X amount of dollars from, you know, whether [Husband] refinances his current residence or takes it out of his retirement account. So, you know, my client just looked at—you know, her question was, All right, how much money am I getting. And that was the number that I gave her.

R.R. at 98a. Wife's attorney asserted that when she discussed the settlement with Wife, they did not base the decision on the Report. She agreed with Husband's interpretation of the Report but argued that the settlement was reached without consideration of the terms of the Report.

Finding that the issue did not implicate interpretation of the Report, the trial court ordered the parties to write briefs addressing "[w]hat type of an agreement was formed when we were in court the last time. . . . Was there an agreement; was there a meeting of the minds; and what, if any, of the [R]eport matters if those were the numbers that you came up with." R.R. at 103a. The trial court expressed that if there was a mistake in entering the

agreement, it was unilateral by Husband. The trial court's subsequent order directed the parties to provide briefs on the remedy for a unilateral mistake.

In his brief, Husband argued again that both parties were under a mutual and material mistake of fact related to the interpretation of the Report and, as a result, the agreement was voidable. He claimed that they misread the Report's division of the proceeds from the sale of the marital home, and that the misreading was the basis for the calculations of Husband's payment to Wife. In the alternative, he claimed that if his mistake was unilateral, Wife knew or should have known about the mistake, rendering the agreement voidable. At oral argument, Husband stated that he believed the parties had calculated the settlement and agreed to distribute the funds in accordance with the Report, with an upward adjustment for Wife's attorney's fees.

In response, Wife argued that irrespective of the terms outlined in the Report, Husband had agreed to pay Wife a total of approximately $136,569, including the funds in escrow. She pointed out that the parties were only in this bargaining position because Husband drew on the HELOC on the marital home without giving notice to Wife. She argued that there was no unilateral mistake and that Husband was now simply attempting to avoid his obligations. Further, she argued that she had given up the equitable interest she would have otherwise held in Husband's new home, as it was purchased in part with marital debt, in consideration of the settlement agreement. She contended

that Husband was not entitled to relief, but if the agreement was voided, she should be permitted to pursue that claim.

Following oral argument, the trial court issued an order finding that there was no factual error in reaching the agreement, but if there was an error, it was Husband's unilateral error. It ordered Husband to comply with the agreement by paying Wife $67,000, less his portions of the mortgage payments for February through April 2020. It directed him to make the payment within 120 days and stated that Wife's petition would remain open pending that final payment. Husband timely appealed[2] and he and the trial court have complied with Pa. R.A.P. 1925.

_____

[2] Because the April 14, 2021 order held Wife's petition open pending final payment, this Court issued a Rule to Show Cause whether the order was final and appealable pursuant to Pa. R.A.P. 341. *See* RTSC, 7/16/21. Husband filed a response arguing that the order was final pursuant to Pa. R.A.P. 341(b)(1) because it "disposes of all claims and of all parties." *See* Response to RTSC, 7/26/21, at unnumbered 2. He argued that the final divorce decree had been entered and the April 14 order disposed of the outstanding dispute related to equitable distribution of the marital home. He contended that if he waited 120 days, his notice of appeal from the order would have been untimely pursuant to Pa. R.A.P. 903. He claimed with his arguments rejected in the trial court that he had no alternative for relief other than the instant appeal.

To determine whether an order is final pursuant to Pa. R.A.P. 341(b)(1), we "look beyond the technical effects of the adjudication to its practical ramifications." *Lustig v. Lustig*, 652 A.2d 393, 394 (Pa. Super. 1995). Our review of the record reveals that the trial court left Wife's petition for relief open for enforcement purposes but fully disposed of the merits of the issues therein. There were no further issues pending at the time of the trial court's order as the parties had fully litigated the issue of the HELOC and Husband's claims of mistake regarding the settlement. Because the order resolved all issues between the parties, we conclude that it was final and appealable.

**II.**

On appeal, Husband substantially restates the arguments he made in the trial court, claiming that the settlement agreement was the result of a mutual mistake of fact or, in the alternative, a unilateral mistake of fact of which Wife knew or should have known.[3]  He seeks to have the settlement agreement reformed to distribute the proceeds from the sale of the marital home in accordance with the Report.

**A.**

A mutual mistake of fact "serves as a defense to the formation of a contract and occurs when the parties to the contract have an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party." ***Murray v. Willistown Township***, 169 A.3d 84, 90 (Pa. Super. 2017) (quoting

---

[3]

> The enforceability of settlement agreements is determined according to principles of contract law.  Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation.  Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision. . . .  With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record.

***Step Plan Servs., Inc. v. Koresko***, 12 A.3d 401, 408 (Pa. Super. 2010) (cleaned up).

***Voracek v. Crown Castle USA, Inc.***, 907 A.2d 1105, 1107-08 (Pa. Super. 2006)).  A contract may be reformed or rescinded based on a mutual mistake if "(1) the mistake relates to an essential fact which formed the inducement to [the contract], and (2) the parties [can be] placed in their former position with reference to the subject-matter of [the contract]." ***Id.*** (citation omitted, cleaned up).  In addition, "the mistake must not be one as to which the party seeking relief bears the risk." ***Step Plan Servs., Inc. v. Koresko***, 12 A.3d 401, 410 (Pa. Super. 2010) (emphasis & citation omitted).  A party seeking reformation or recission based on a mutual mistake must present clear and convincing evidence of the mistake. ***Smith v. Thomas Jefferson Univ. Hosp.***, 621 A.2d 1030, 1032 (Pa. Super. 1993).

Here, Husband argues that he and Wife were mutually mistaken about the unambiguous language in the Report dividing the proceeds from the sale of the marital home.  His claim is predicated on the assumption that both parties calculated the settlement agreement in accordance with the terms of the Report.  However, after reviewing the record of the November 30 hearing, the language the parties used to place the agreement on the record and Wife's explanation of her understanding of the agreement, the trial court rejected Husband's version of events.

Instead, it concluded that rather than relying on the Report to calculate Husband's final payment to Wife, the parties reached a global settlement of all claims, including those arising after the Master issued the Report and the

trial court entered the Order. That settlement did not simply dispose of the proceeds of the marital home, which were originally accounted for in the Report, but also resolved Wife's claims related to Husband increasing marital debt unilaterally, her equitable interest in his new home and the attorney's fees she expended to pursue her remedy. Upon learning that Husband believed they had mistakenly calculated the settlement, Wife maintained that her understanding of the hearing was that they had negotiated for a sum certain and had not based the settlement on the Report. Under these circumstances, the record supports the trial court's factual determination. *See Gocek v. Gocek*, 612 A.2d 1004, 1008-09 (Pa. Super. 1992) (finding no clear and convincing evidence of mutual mistake when defendant specifically denied plaintiff's factual allegations regarding the meaning of disputed contract term in his pleadings).

Additionally, Wife's request for relief in her petition does not rely on the terms of the Report, further supporting the trial court's determination that she did not agree to settle the dispute under the terms set forth by the Master. She requested to be reimbursed for the full value of the HELOC in addition to the funds in escrow, as well as attorney's fees for litigating the matter. She contended that because Husband used marital debt to purchase his new home, she was entitled to pursue an equitable interest in that residence—an equitable interest that did not exist at the time the Master issued the Report. She agreed not to pursue that interest in consideration of the $67,000

payment Husband agreed to at the hearing. Thus, while the parties began negotiating the resolution of Wife's petition based in part on the Report, the trial court did not abuse its discretion by concluding that Wife was not agreeing to a settlement that would be bound entirely by the Report.

Husband acknowledges that Wife agreed to waive her claim regarding her purported equitable interest in his new residence, but maintains that the parties intended to base the settlement entirely on the calculations in the Report. It is unclear why Wife would waive an interest she had claimed in her petition only to reset the distribution of proceeds back to the status quo before Husband drew on the HELOC without her knowledge. Essentially, Husband argues that Wife forfeited her claim in exchange for nothing. To the contrary, the record supports the trial court's conclusion that while the parties referred to the Report as a starting-off point for negotiations, Wife did not intend the Report to control the distribution of proceeds but rather accepted a specific sum in settlement of all her claims.

Because Husband has not adduced clear and convincing evidence that there was a mutual mistake as to an essential element of the settlement agreement, his first claim merits no relief.

**B.**

Next, Husband argues in the alternative that he was unilaterally mistaken about the terms of the Report when calculating the settlement, and that he is entitled to reformation because Wife knew or should have known

about his mistake. He refers to the hearing where he stated his mistaken interpretation of the Report on the record: "And the way the Master's report is worded is [Wife] gets 75 percent of 178,069, of the proceeds, after the first 9431 are distributed to [Husband]. So, the way I interpret that is, the remaining balance is going to go to Wife because we didn't hit that threshold." R.R. at 72a. Counsel for Wife stated that she agreed with the interpretation. Based on this exchange, Husband argues that Wife knew or should have known that he agreed to the settlement based on a mistaken interpretation of the Report, but she did not correct his mistake.

"Generally, if a mistake is not mutual, but unilateral, and is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, it affords no basis for relief." **Kramer v. Schaeffer**, 751 A.2d 241, 246 (Pa. Super. 2000) (citation omitted). However, if the party who is not mistaken knows or should have known about the other party's mistake, relief is granted to the same extent as a mutual mistake. **Id.** (citation omitted). "In such a situation, the mistaken party may void the contract if the mistake is regarding a material term or the mistaken party may enforce the contract so that the other party for whose benefit the contract was performed will not be unjustly enriched." **Lapio v. Robbins**, 729 A.2d 1229, 1234 (Pa. Super. 1999) (citation omitted).

Again, Husband's argument assumes that both parties understood the settlement agreement to be based on the distribution terms in the Report. It

appears that both parties misread the clause of the Master's report at the outset of the hearing. However, as discussed in Section II.A, *supra*, the trial court's factual finding that Wife did not rely solely on the Report in negotiating the settlement is well-supported by the record. Throughout the negotiations, Wife made clear that she waived a claim she had presented in her petition for relief and reduced her demand for attorneys' fees in consideration of the settlement that the parties reached on the record. There is no indication in the record that after reaching their specific agreement, Wife knew or should have known that Husband believed the settlement agreement simply enforced the terms of the Report.[4] Rather, the record reflects a global resolution of all of the parties' pending petitions and claims and falls short of the clear and convincing evidence necessary to reform the agreement based on Husband's unilateral mistake. No relief is due.

Order affirmed.

---

[4] *Lapio v. Robbins*, 729 A.2d 1229 (Pa. Super. 1999), which Husband relies on in support of his argument for unilateral mistake, does not compel a different conclusion. The determination of whether a mistake existed is fact-specific and turns on the circumstances surrounding the contract formation in a particular case. *Id.* at 1232. In *Lapio*, the defendant testified at his deposition that the plaintiff had accurately recounted their discussions leading to the formation of the contract and admitted to much of the conduct that led to the plaintiff's mistaken impression about the terms of their agreement. *Id.* at 1232-33. Put simply, the quantum of evidence in support of the unilateral mistake in *Lapio* was much higher than is present in this case, meeting the clear and convincing standard necessary for relief.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/9/2022